1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTEM ROYZMAN,<br>CDCR #AM-6676,<br><br>                              Plaintiff,<br><br>     v.<br><br><br>MIGUEL LOPEZ, Correctional Officer;<br>ALEJANDRO GONZALES, Correctional<br>Sergeant; EDGAR GARCIA, Correctional<br>Captain,<br><br>                              Defendants. | Case No. 21-cv-1429-BAS-AHG<br><br>**ORDER:**<br><br>**(1) GRANTING DEFENDANTS'<br>REQUEST FOR JUDICIAL<br>NOTICE; AND**<br><br>**(2) GRANTING IN PART AND<br>DENYING IN PART<br>DEFENDANTS' MOTION TO<br>DISMISS**<br><br>**[ECF No. 17]** |

     Before the Court is Defendants' Motion brought pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss this action. (Mot., ECF No. 17.) Plaintiff opposes (Opp'n, ECF No. 19), and Defendants reply (Reply, ECF No. 20).

     Plaintiff, a state inmate currently incarcerated at R.J. Donovan State Prison ("RJD") located in San Diego, California and proceeding *pro se*, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. (*See* Compl., ECF No. 1.) In his Complaint, Plaintiff alleges Defendants Lopez, Garcia, and Gonzalez violated his constitutional and statutory rights

- 1 -

when they intentionally deprived him of tefillin,[1] a religious item used for prayer. (*Id.* at 5.) Defendants move to dismiss (Mot. 1) and file a Request for Judicial Notice (ECF No. 17-1).

Having considered the parties' filings, the Court **GRANTS** Defendants' Request for Judicial Notice, and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss.

# I.   BACKGROUND[2]

## A.   Plaintiff's Allegations

Plaintiff is a religiously observant Jewish person. (Compl. 3.) On or about April 1, 2021, Plaintiff sent a letter to the ALEPH Institute,[3] requesting he be provided with tefillin in order "to fulfill the commandments of the Torah." (*Id.* at 3.) Tefillin are listed as an approved religious item by the California Department of Corrections and Rehabilitation ("CDCR") (*see* Ex. B to Req. Jud. Not. 15, ECF No. 17-1), and Plaintiff "verified that ALEPH was an approved vendor to provide the Jewish inmates housed in the CDCR with religious materials" (Compl. 3).

On April 21, 2021, Defendant Lopez, an RJD correctional officer, came to Plaintiff's housing unit to distribute "books and special purchase items." (*Id.* at 3.) Lopez told Plaintiff there were items on his distribution list. (*Id.*) He opened a box with Plaintiff's name on it, containing tefillin and religious books. (*Id.*) Lopez gave Plaintiff the books but refused to give him the tefillin. (*Id.* at 3–4.) Lopez said that he would have to "check with his supervisors." (*Id.*) Plaintiff objected and explained that the tefillin were an "approved

---

[1] Tefillin (also known as Phylacteries) are two "black leather boxes containing scriptural passages which are bound by black leather straps on the left hand and on the head and worn for the morning services on all days of the year except Sabbaths and scriptural holy days." 19 Encyclopedia Judaica 577 (Fred Skolnik & Michael Berenbaum eds., 2d ed. 2007).

[2] The facts are all taken from the Complaint (Compl., ECF No. 1). For the pending Motion, the Court accepts all of Plaintiff's factual allegations as true. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[3] ALEPH provides "religious artifacts and books to inmates incarcerated throughout the United States." (Compl. 3.)

religious item" and "central to [his] religious beliefs in the practice of Judaism." (*Id.* at 4.) Lopez still refused to give Plaintiff the tefillin, stating he had "never heard of it being a necessary religious item needed by a [J]ew." (*Id.*) Plaintiff protested, "You're going to pass out religious beads to the Native Americans, and Muslim oils and prayer rugs to the Muslims[,] but you won't let me have my Jewish tefillin?" (*Id.*) Lopez did not reply, repacked the tefillin, and left. (*Id.*)

After about 48 hours passed with no word, Plaintiff sent a "Request for Interview" addressed to Lopez, in which he explained the importance of the tefillin to the practice of his religion and inquired about its return. (*Id.*) When Plaintiff received no response, he sent another "Request for Interview" on April 26, 2021, this time to the RJD rabbi, Fabrice Hadjadj. (*Id.* at 4–5.) Plaintiff met with Rabbi Hadjadj shortly thereafter and explained the situation. (*Id.* at 5.) The rabbi told Plaintiff that he would "look into the matter and inform the proper parties that the Tefillin was an approved religious item." (*Id.*) Plaintiff later learned that the tefillin had been sent back to the vendor the day after Lopez refused to give it to him.[4] (*Id.*) Neither Lopez nor any other CDCR staff member informed Plaintiff the item had been returned or consulted with Rabbi Hadjadj about the religious significance of tefillin. (*Id.*)

After attempting to speak to RJD staff informally to no avail, Plaintiff submitted a formal 602 Administrative Grievance on April 27, 2021. (*Id.*) About a week later, Plaintiff saw Lopez and asked him about the tefillin. (*Id.*) Lopez responded, "I left it on the counter in [Receiving and Release.] I don't know who sent them back. There must have been a reason it's sent back[.] I guess you can't have it. If you don't like it or don't agree, file paperwork." (*Id.*)

Subsequently, Lopez was working in Plaintiff's housing unit and asked Plaintiff, "Do you want to talk about that issue or are you done with trying to go any further?" (*Id.*

---

[4] Plaintiff alleges ALEPH shipped the tefillin to the prison three times before Plaintiff finally received it. (Compl. 7.)

at 6.) Plaintiff replied, "You took an approved religious item from me, my tefillin, and I am currently pursuing the issue further." (*Id.*) This time, Defendant Lopez claimed the tefillin had "exceeded $300 in cost" and therefore was not permitted. (*Id.*) Plaintiff informed Lopez that the vendor, ALEPH, provided its items to incarcerated persons for free. (*Id.*) Furthermore, Plaintiff asked Defendant Lopez to check the Receiving and Release records because "unless the tefillin had been dangerous to the health and safety of inmates, the CDCR has readily allowed Jewish inmates practicing their faith to receive tefillin from ALEPH." (*Id.*) Lopez asked Plaintiff, "How much time do you have?" (*Id.*) Plaintiff replied that he had four years left on his sentence. (*Id.*) Lopez retorted, "You can get any kind of tefillin you want when you get out, but not here, not while I'm working here!" (*Id.*)

Sometime in May 2021, Plaintiff was summoned to Receiving and Release and questioned by Defendant Lopez and Defendant Gonzalez, an RJD Sergeant and Defendant Lopez's supervisor, regarding Plaintiff's 602 Administrative Grievance. (*Id.* at 6.) Plaintiff again explained that the item was approved and obtained through a known vendor, and Gonzalez said he would "look into it." (*Id.* at 7.) After the meeting, Plaintiff saw Rabbi Hadjadj, who told Plaintiff he would contact Defendant Garcia, an RJD Captain, about "the issue of Jewish inmates being unable to receive tefillin in the CDCR." (*Id.*) The rabbi called Garcia, who purportedly refused to get involved despite being supervisor to Defendants Gonzalez and Lopez. (*Id.*)

In late June, Plaintiff was called to the rabbi's office where he was met by Chief Deputy Warden Belinda Hedrick. She gave Plaintiff the tefillin and "apologized for the officers' actions in denying [him] the Tefillin." (*Id.*) Hedrick conceded the item was "listed as allowable religious personal property." (*Id.*) She further stated that "this action would never occur again from [Receiving and Release] personnel at [RJD]" and that "the officers thus far named had been counseled on religious rights." (*Id.*)

Plaintiff appends to his Complaint the final shipping receipt from ALEPH, dated

June 22, 2021. (Ex. D to Compl. 24, ECF No. 1.) Thus, the Complaint alleges that from April 21, 2021 to at least June 22, 2021, Plaintiff was deprived of his tefillin—a 62-day deprivation.

### B.   Procedural Background

Plaintiff filed his Complaint and Motion to Proceed *in forma pauperis* in this case on August 10, 2021. (ECF Nos. 1, 2.) The Court denied Plaintiff's Motion to Proceed *in forma pauperis* and directed him to pay the initial civil filing fee to proceed with this matter. (ECF No. 4.) Plaintiff paid the filing fee, and the Court conducted the required pre-answer screening pursuant to 28 U.S.C. § 1915A. (ECF No. 6.)

The Court found that Plaintiff's Complaint contained factual allegations that survived the "low threshold" for proceeding past the pre-answer screening required by 28 U.S.C. § 1915A(b). (ECF No. 6 at 5). Defendants filed a waiver of service (ECF No. 15) and subsequently filed the present Motion (Mot).[5]

## II.   Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). "A Rule 12(b)(6) dismissal may be based on either a 'lack of cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

Courts hold the allegations of *pro se* plaintiffs to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Still, a

---

[5] Defendants also seek judicial notice of a CDCR document titled "Religious Personal Property Matrix (Revised 6/27/13)," which is incorporated by reference into California Code of Regulations. (Req. Jud. Not., ECF No. 17-1.) The Court "may take judicial notice of a record of a state agency not subject to reasonable dispute." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1223 n.2 (9th Cir. 2004). Plaintiff does not object to Defendants' request, nor does there appear to be a "reasonable dispute" as to the accuracy of these records. Thus, the Court **GRANTS** Defendants' Request for Judicial Notice. (ECF No. 17-1.)

complaint must plead sufficient factual allegations to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *see also Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995) ("Although we construe pleadings liberally in their favor, pro se litigants are bound by the rules of procedure."). The Court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The Court, however, need not accept conclusory allegations as true. Rather, it must "examine whether conclusory allegations follow from the description of facts as alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III.   ANALYSIS

Defendants contend: (1) Plaintiff has failed to properly exhaust his administrative remedies, (2) he fails to state a First or Fourteenth Amendment claim, (3) he is not entitled to money damages under RLUIPA, (4) Eleventh Amendment sovereign immunity bars his official-capacity claims for damages, and (5) Defendants are entitled to qualified immunity. The Court analyzes each in turn.

### A.   Exhaustion of Administrative Remedies

Defendants argue that Plaintiff did not fully exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a), because his Complaint includes allegations not raised in his April 27, 2021 administrative appeal. Specifically, Defendants argue (1) although Plaintiff may have exhausted some of his claims against Defendant Lopez, he failed to exhaust any of his claims against Defendants Gonzalez and Garcia and (2) Plaintiff exhausted only claims related to interactions with Defendant Lopez that predate his April 27, 2021 administrative appeal. (Mot. 9–10.) The Court disagrees.

"The Prison Litigation Reform Act of 1995 (PLRA) mandates that an inmate

exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016) (quoting 42 U.S.C. § 1997e(a)). "There is no question that exhaustion is mandatory under the PLRA[.]" *Jones v. Bock*, 549 U.S. 199, 211 (2007). The "administrative remedies" are defined, not by the PLRA, but by the correctional institution's regulations—here, the CDCR's procedural rules. *See id.* at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

However, because the failure to exhaust is an affirmative defense, defendants bear the burden of raising it and proving the absence of exhaustion. *Id.* at 211–12; *see also Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (noting defendants must "present probative evidence— . . . to 'plead and prove'—that the prisoner has failed to exhaust available administrative remedies under § 1997e(a)"). "In the rare event that a failure to exhaust is clear from the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." *Albino*, 747 F.3d at 1166. Otherwise, defendants are not entitled to dismissal under Rule 12(b)(6). *See id.* Rather, they must move for summary judgment under Rule 56 and show that the undisputed evidence, viewed in the light most favorable to plaintiff, demonstrates plaintiff's failure to exhaust. *See id.*

To begin, Plaintiff plausibly alleges that he followed the proper administrative appeal process. The Complaint asserts that he submitted an administrative grievance on April 27, 2021. (Compl. 9.) He further alleges, "[A] response was returned from the [RJD] Office of Grievances indicating that [it'd] failed to complete a response within their time constraints of 60 calendar days. This concluded [the] inmate appeal process and exhaustion of administrative remedies available to Plaintiff Artem Royzman." (*Id.*) In corroboration, Plaintiff appends to his Complaint a document entitled "Claimant Grievance Claims Decision Response," dated June 27, 2021, indicating that CDCR regulations "provide[] the Office of Grievances 60 calendar days to complete a response" to an inmate grievance and "[d]ue to the expiration of time, this response by the Office of Grievances will be the only

response." (Ex. C to Compl. 19, ECF No. 1.) Thus, Plaintiff plausibly alleges he exhausted at least some claims, and Defendants concede as much (Mot. 16–17).

Defendants' challenge, therefore, hinges on substance rather than procedure. First, Defendants argue Plaintiff failed to exhaust claims against Defendants Gonzalez and Garcia because Plaintiff failed to mention them in his April 27, 2021 administrative grievance. (Mot. 17.) In support, Defendants cite the California regulations governing inmate grievances to show that inmates must include the "names and titles of all involved staff members (or a description of those staff members)." (*Id.* at 16 (citing Cal. Code Regs. tit. 15 § 3482(c)(1)–(2)).) But Defendants selectively quote this regulation. It reads in full:

> To submit a grievance, a claimant shall . . . describe *all information known and available* to the claimant regarding the claim, including key dates and times, names and titles of all involved staff members (or a description of those staff members), and names and titles of all witnesses, *to the best of the claimant's knowledge.*

Cal. Code Regs. tit. 15, § 3482(c) (emphasis added). Plaintiff's allegations indicate he complied with these regulations. He provided the information known to him at the time of the administrative appeal, including the name of Correctional Officer Lopez. Defendants Gonzalez and Garcia became involved in withholding the tefillin after Plaintiff filed his administrative grievance. As a result, the California regulations did not require Plaintiff to name them in his grievance.

The PLRA requires plaintiffs to comply with the relevant "prison grievance procedures" and no more. *See Jones*, 549 U.S. at 218 ("Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'"). "Exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievances." *Id.* at 219. "[T]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Johnson v. Johnson*, 385 F.3d 503, 522 (5th Cir. 2004). Hence, the PLRA does

not require Plaintiff to have named Defendants Gonzalez and Garcia in his administrative appeal in order to state a claim against them in his Complaint.

Second, Defendants argue that because Plaintiff filed his administrative appeal six days after his initial confrontation with Defendant Lopez, he only exhausted administrative remedies with respect to a six-day deprivation. (Mot. 17.) Defendants misunderstand the exhaustion requirement. Although the PLRA requires plaintiffs to exhaust administrative remedies for each claim, it does not require exhaustion with respect to each interaction alleged in the Complaint. *Cf. Jones*, 549 U.S. at 2018 (noting that the purpose of exhaustion is to allow "a prison to address complaints about the program it administers before being subjected to suit" and holding that the PRLA does not mandate a specific level of detail necessary for exhaustion). The issue in Plaintiff's administrative appeal is the same as the issue in his Complaint: the withholding of tefillin in violation of his religious liberty. All the subsequent interactions with Defendant Lopez also pertain to denial of tefillin. Thus, the PLRA does not require the Court to lop off Plaintiff's more recent allegations simply because he promptly filed his administrative grievance. To do so would be to misconstrue the purpose and effect of the PLRA exhaustion requirement.

Plaintiff's April 27 administrative appeal plausibly alerted CDCR as to the nature of the wrong that Plaintiff now seeks to redress. *See Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("A grievance suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress."). This action is not "the rare event that a failure to exhaust is clear from the face of the complaint" in which it can be resolved with a Rule 12(b)(6) motion. *See Albino*, 747 F.3d at 1166.

Accordingly, the Court will not dismiss Plaintiff's claims based on a failure to exhaust under the PLRA.

**B. First Amendment Claim**

Defendants seek dismissal of Plaintiff's First Amendment free exercise claim on the ground that Defendants did not substantially burden his ability to practice his religion. They

argue withholding the tefillin was a "simple error" and "nothing more than a *de minimis* delay," not rising to the level of a constitutional violation. (Mot. 18–21.) But the Court has no trouble plausibly inferring that the 62-day delay in receiving an item necessary for prayer was a substantial burden.

"The right to the free exercise of religion is a precious American invention, distinguishing our Constitution from all prior national constitutions." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). Under the First Amendment, government action may not "substantially burden [a] person's practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). Incarceration does not obliviate this right. *Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). But courts are sensitive to the "inordinately difficult undertaking" of running a prison. *See id.* at 85. Thus, the standard established in *Turner v. Safley* strikes a balance: "[A] prisoner's Free Exercise Clause claim will fail if the state shows that the challenged action is 'reasonably related to legitimate penological interests.'" *Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015) (quoting *Turner*, 482 U.S. at 89). In sum, to state a free exercise claim, an incarcerated person must show that a prison regulation or condition (1) substantially burdened his practice of religion and (2) is not reasonably related to a legitimate penological interest. *See Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (analyzing "substantial burden" before applying the *Turner* test). Defendants only challenge the first prong. (Mot. 18–21.)

A "substantial burden" is more than "an inconvenience" and has "a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013) (cleaned up).[6] Weighing a substantial versus de minimis

---

[6] In *Shakur v. Schriro*, the Ninth Circuit clarified the definition of "substantially burden." 514 F.3d at 884–85. The court confronted the question "whether a prisoner must objectively show that a central tenet of

21cv1429

burden is fact intensive. *See Patel v. Bureau of Prisons*, No. CV 09-200 (RWR), 2011 WL 13253660, at \*5 (D.D.C. Sept. 12, 2011) ("[The] adjudication of religious claims is a highly fact-specific exercise."); *Kennedy v. Meacham*, 540 F.2d 1057, 1061 (10th Cir. 1976) (vacating the district court's dismissal because it was made without a responsive pleading or "proof of the surrounding circumstances"); *cf. United States v. Quaintance*, 315 F. App'x 711, 713 (10th Cir. 2009) (unpublished) ("[W]hether a particular question is 'substantial' [under the Religious Freedom Restoration Act] must be determined on a case-by-case basis.").

Defendants must convince the Court that withholding tefillin for 62-days, as alleged in the Complaint, does not state a claim under the First Amendment.[7] In an effort to do so, they provide a series of string cites, highlighting decisions that determined isolated or short-term deprivations were not substantial. (Mot. 18–21.) But each of Defendants' authorities arose at the summary judgment stage or later. Given the fact-specific nature of the "substantial burden" inquiry, the Court is not moved by these cases. At summary judgment, the parties and the Court have the benefit of factual exposition, and the Court may examine the evidence unearthed in discovery. That is not the case at the motion to dismiss stage.

The Court cannot say that, as a matter of law, a 62-day deprivation of Plaintiff's tefillin was a *de minimis* burden on his religious practice. In his Complaint, Plaintiff alleges that the tefillin are necessary to "fulfill the commandments of the Torah . . . for the Jewish

---

his faith is burdened by a prison regulation to raise a viable claim under the Free Exercise Clause," and answered no. *Id.* A court need not analyze whether a religious practice is "central" to a plaintiff's beliefs. *Id.* Rather, all that is required is to decide that the plaintiff's "proffered belief [is] sincerely held." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d at 885 ("Given the Supreme Court's disapproval of the centrality test, we are satisfied that the sincerity test set forth in *Malik* . . . determines whether the Free Exercise Clause applies."). Thus, courts must determine that the belief is sincerely held, but need not inquire into how important or "central" the belief is to the religion.

[7] Defendants attempt to argue that the relevant inquiry is whether a six-day delay is a substantial burden, because Plaintiff only exhausted allegations of facts prior to April 27, 2021. As discussed above, the Court rejects Defendants' exhaustion argument, and therefore, analyzes the full 62-day deprivation.

- 11 -

male to don the tefillin in daily prayers." (Compl. 3.) Drawing reasonable inferences in favor of Plaintiff, the Court finds it plausible that a 62-day delay in receiving his tefillin substantially burdened a sincerely held religious belief.

Accordingly, Defendants' Motion to Dismiss Plaintiff's First Amendment free exercise claim is **DENIED**.

### C.    Fourteenth Amendment Equal Protection Claim

The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyer v. Doe*, 457 U.S. 202, 2016 (1982)). This means that "[p]risons must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)), *overruled in part on other grounds by Shakur*, 514 F.3d at 885.

To state a claim under the Equal Protection Clause, an incarcerated person must plead (1) he was subject to intentional discrimination based on his religious beliefs and (2) the difference in treatment was not reasonably related to a legitimate penological interest. *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991) (clarifying that the Equal Protection Clause protects against *intentional* discrimination); *Shakur*, 514 F.3d at 891 (applying the *Turner* standard, which inquires whether a prison condition or regulation is "reasonably related to legitimate penological interests").

### 1.    Defendant Lopez

Plaintiff plausibly pleads that Defendant Lopez intentionally discriminated against him based on his Jewish faith and that the discrimination was not reasonably related to a legitimate penological interest. (Compl. 3–4.) After Plaintiff explained that the tefillin were an "approved religious item" and "central to [his] religious beliefs in the practice of

- 12 -

Judaism," Defendant Lopez replied he had "never heard of it being a necessary religious item needed by a [J]ew." (*Id.*) Plaintiff argued, "You're going to pass out religious beads to the Native Americans, and Muslim oils and prayer rugs to the [M]uslims[,] but you won't let me have my Jewish tefillin?" (*Id.*) Still, Defendant Lopez returned the tefillin to Receiving and Release, and they were sent back to ALEPH. (*Id.* at 4–5.) After Plaintiff filed administrative grievance paperwork, Defendant Lopez confronted Plaintiff about the "issue" of the tefillin grievance. (*Id.* at 6.) During this interaction, Plaintiff informed Defendant that the tefillin were an approved item and that ALEPH provided them to him for free. Defendant Lopez replied, "You can get any kind of tefillin you want when you get out, but not here, not while I'm working here!" (*Id.*)

Making reasonable inferences in favor of Plaintiff, the Court finds it plausible that Defendant Lopez treated Plaintiff differently than members of other faiths when he refused to give Plaintiff an approved religious item, failed to inform Plaintiff that the tefillin had been returned, and ignored Plaintiff's explanation that ALEPH provided the tefillin at no cost. Further, the Court can infer intentional discrimination from Defendant Lopez's actions and statements. Defendant Lopez promised that Plaintiff would never receive the tefillin, seemingly regardless of their religious purpose, cost, and pre-approved status. These allegations are sufficient to plausibly infer purposeful discrimination.

Plaintiff must also plausibly plead that the difference in treatment was not reasonably related to a penological interest. Defendants argue Plaintiff cannot allege an equal protection claim because he "conceded that RJD staff sent back the tefillin to the sender because Receiving and Release staff believed it was worth over $300" and there is no "allegation supporting a contention that any defendant discriminated against Plaintiff due to his faith." (Mot. 22.) But Defendants' argument suffers from two layers of shortcomings.

First, it is not clear that the tefillin-value-limit regulation is reasonably related to a legitimate penological interest. Defendants fail to identify such an interest, and gesturing to prison regulations is insufficient. In *Turner*, the Supreme Court made clear that arbitrary

- 13 -

regulations may impinge on incarcerated persons' rights and, therefore, must be underpinned by a legitimate penological interest. *See Turner*, 482 U.S. at 81 (determining the constitutionality of a prison regulation). The prison regulations limit the value of tefillin to less than $300 dollars but do not have a price limit for other potentially valuable religious items, like rune tiles, beaded head bands, or altar cloths. (Ex. B 15, ECF No. 17-1.) It may be that the prison has a legitimate penological reason for limiting tefillin to those valued under $300, but it is not obvious what it is.

Second, it is not clear that Defendant Lopez's actions were reasonably related to the $300 value limit. Several allegations indicate otherwise. First, Plaintiff repeatedly informed Defendant Lopez that the tefillin were provided to him for free. (Compl. 4–7.) Second, Defendant Lopez stated that Plaintiff would not receive tefillin, "not while I'm working here." (*Id.* at 6.) Finally, the Chief Deputy Warden informed Plaintiff that the Rabbi should have been consulted and the tefillin were listed as "allowable religious personal property." (*Id.* at 7.) Given these allegations, Plaintiff plausibly alleges that Defendant Lopez's actions depriving the tefillin were not reasonably related to a legitimate penological interest.

Thus, the Complaint plausibly alleges an equal protection claim against Defendant Lopez.

### 2.    Defendants Gonzalez and Garcia

The same is not true of the equal protection claims against Defendants Gonzalez and Garcia. After *Ashcroft v. Iqbal*, there is no supervisory liability under Section 1983. 556 U.S. 662, 676–77 (2009) ("Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose."). As such, Plaintiff must plead intentional discrimination with respect to each Defendant. *OSU Student All. v. Ray*, 699 F.3d 1053, 1074 (9th Cir. 2012) (noting that "invidious discrimination under the Equal

21cv1429

Protection Clause and the First Amendment Free Exercise Clause" requires specific intent). Deliberate indifference is not enough; each Defendant must have acted with purpose. *Id.*

Plaintiff fails to plausibly allege intentional discrimination by Defendants Gonzalez and Garcia. The only allegations as to Defendant Gonzalez are that he interviewed Plaintiff following the filing of the administrative grievance, asked Plaintiff questions relating to his grievance, and informed Plaintiff that he would communicate any further issues. (Compl. 6–7.) As to Defendant Garcia, the only allegation is that the rabbi had a conversation with him, and he refused to intervene in the situation. (*Id.* at 7.) To infer intentional discrimination from these minimal allegations is too far a leap. Thus, the Court finds Plaintiff's allegations fail to support an equal protection claim against Defendants Gonzalez and Garcia.

*   *   *

Accordingly, the Motion to Dismiss with respect to Plaintiff's Fourteenth Amendment Equal Protection Clause claim against Defendant Lopez is **DENIED**, and the Motion to Dismiss with respect to Plaintiff's Fourteenth Amendment Equal Protection Clause claims against Defendants Gonzalez and Garcia is **GRANTED**.

### D.   Fourteenth Amendment Due Process Claim

Plaintiff's last constitutional claim comes under the Due Process Clause of the Fourteenth Amendment. "Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). However, the negligent deprivation of property does not necessarily form a due process claim under Section 1983 if the deprivation was "unauthorized" by "established state procedure." *See Parratt v. Taylor*, 451 U.S. 527, 542–43 (1981) (finding no due process violation because "[a]lthough [the plaintiff had] been deprived of property under color of state law, the deprivation did not occur as a result of some established state

- 15 -

procedure"), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986). When a state provides an adequate post-deprivation remedy, through a state tort action for example, the existence of that remedy satisfies the requirements of due process. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (holding that intentional destruction of inmate's property does not violate the Fourteenth Amendment Due Process Clause when an adequate post-deprivation state remedy exists); *Zinermon v. Burch*, 494 U.S. 113, 128 (1990) ("In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." (citations omitted)).

Here, an adequate post-deprivation remedy exists. The Ninth Circuit has recognized that "California law provides such an adequate post-deprivation remedy for any property deprivations." *Barnett v. Centoni*, 31 F.3d 813, 816–17 (9th Cir. 1994) (citing Cal. Gov't Code §§ 810–95). The California Government Code makes a public employee "liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820; *see also id.* § 844.6(d) ("Nothing in this section [titled 'Injuries by and to prisoners'] exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission."). Plaintiff's Complaint is bereft of any allegation that the post-deprivation remedy provided under state law is inadequate. Therefore, Plaintiff has failed to plead a colorable due process claim.

The Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's Fourteenth Amendment due process claims.

### E.    Claim for Money Damages under RLUIPA

Plaintiff also claims damages for statutory violations under RLUIPA, naming Defendants in their individual and official capacities. (Compl. 3.) Defendants move to dismiss his RLUIPA claim, arguing RLUIPA does not "authorize money damages against state officials, whether sued in their official or individual capacities." (Mot. 23.) The Court agrees.

Sovereign immunity blocks Plaintiff's claim for damages against Defendants in their official capacities. In 2011, the Supreme Court held that states do not "consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver." *Sossamon v. Texas*, 563 U.S. 277, 293 (2011). Because sovereign immunity extends to individuals in their official capacities, "[t]he Eleventh Amendment bars [a prisoner's] suit for official-capacity damages under RLUIPA." *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1112 n.4, 1114 (9th Cir. 2010).

Nor does RLUIPA provide for money damages against state officials in their individual capacities. "[T]here is nothing in the language or structure of RLUIPA to suggest that Congress contemplated liability of government employees in an individual capacity." *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014). Therefore, Plaintiff cannot state an individual-capacity claim for damages under RLUIPA either.

Thus, Plaintiff's claim for monetary damages against Defendants under RLUIPA fails. Defendants' Motion to Dismiss Plaintiff's claim for monetary damages under RLUIPA is **GRANTED** without leave to amend as futile.

### F.      Official Capacity Claims and Sovereign Immunity

Defendants argue that Plaintiff's constitutional claims for monetary damages against them in their official capacities are also barred by Eleventh Amendment sovereign immunity. (Mot. 24.) The Court agrees.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). As a result, an official-capacity suit for damages is the same as a suit against the state itself with respect to sovereign immunity. *Id.* The Eleventh Amendment bars such suits absent state waiver or congressional abrogation. *Id.* at 66. Here, California has not waived nor has Congress abrogated sovereign immunity. *See id.* 66–67 (holding Congress did not abrogate state sovereign immunity in passing Section 1983).

Therefore, sovereign immunity bars Plaintiff's claims for damages against Defendants in their official capacities.

Moreover, there is an even more fundamental flaw in Plaintiff's pleading: state actors sued in their official capacities are not "persons" under Section 1983, and therefore are not liable. *Id.* at 71. Thus, an official-capacity suit for damages under Section 1983 cannot go forward.

Section 1983 does, however, cover state officials sued in their individual capacities, and sovereign immunity does not apply to individual-capacity defendants. *Hafer v. Melo*, 502 U.S. 21, 31 (1991) (holding officials sued in their individual capacities are "persons" under Section 1983); *Pena v. Gardner*, 976 F.2d 469, 472–73 (9th Cir. 1992) ("It is thus clear that the eleventh amendment will bar [plaintiff] from bringing his claims in federal court against the state officials in their *official* capacities. It will not, however, bar claims against the state officials in their *personal* capacities.").

Consequently, the Court **GRANTS** Defendants' Motion to Dismiss on Eleventh Amendment grounds, but only to the extent that Plaintiff seeks damages against them in their official capacities.

### G.    Individual Capacity and Qualified Immunity

What remains are Plaintiff's constitutional claims against Defendants in their individual capacities. Defendants argue they are entitled to qualified immunity. (Mot. 25.) Qualified immunity is an affirmative defense that partially shields state actors from being sued for money damages. *See Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001). "Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendants conduct violated a

statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time it is alleged to have been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

The above analysis demonstrates Plaintiff has pleaded plausible constitutional violations against Defendants—against all three Defendants under the Free Exercise Clause and against only Defendant Lopez under the Equal Protection Clause. Therefore, the issue is whether the free exercise and equal protection rights at issue were "clearly established" when Defendants withheld the tefillin in 2021.

A right is "clearly established" when its bounds are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Indeed, "in an obvious case, [highly generalized] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

Deciding a motion to dismiss based on qualified immunity requires "[b]alancing [] competing rules." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). On the one hand, the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). On the other hand, however, the Ninth Circuit has found that "[d]etermining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making." *Keates*, 883 F.3d at 1234. A motion to dismiss based on qualified immunity requires the court "to decide these weighty questions aided only by the skeletal— at best—factual picture sketched out in the complaint." *Wong v. United States*, 373 F.3d 952, 956 (9th Cir. 2004), *overruled in part on other grounds*, *Wilkie v. Robbins*, 551 U.S 537 (2007). "When, as here, defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless we can determine, based on the

- 19 -

complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (cleaned up); *see also Keates*, 883 F.3d at 1235 ("[O]ur decision at the motion-to-dismiss stage sheds little light on whether the government actors might ultimately be entitled to qualified immunity 'were the case permitted to proceed, at least to the summary judgment stage' and the court is presented with facts providing context for the challenged actions." (citation omitted)).

Here, the Court cannot determine, based on the complaint itself, that qualified immunity applies to Plaintiff's equal protection or free exercise claim:

First, qualified immunity does not apply to Plaintiff's equal protection claim because equal protection violations require intentional discrimination. The Ninth Circuit has determined that "a government official is not entitled to qualified immunity from a Section 1981 or 1983 action that is based on a claim of intentional discrimination." *Gutierrez v. Mun. Ct. of Se. Jud. Dist.*, 838 F.2d 1031, 1050–51 (9th Cir. 1988), *vacated on mootness grounds sub nom. Mun. Ct. of Se. Jud. Dist. v. Gutierrez*, 490 U.S. 1016 (1989); *see also Yoshikawa v. Seguirant*, 41 F.4th 1109, 1118 (9th Cir. 2022) ("We have long held that a public official is not entitled to qualified immunity in a § 1981 case if he is accused of intentional racial discrimination." (citing *id.*)).[8] The Court found *supra* that Plaintiff plausibly pleads Defendant Lopez intentionally discriminated against him. Therefore, Defendant Lopez cannot assert qualified immunity as a shield against plausible allegations of intentional discrimination under the Equal Protection Clause.

Second, Defendants are not entitled to qualified immunity on the face of Plaintiff's free exercise allegations. Supreme Court precedent paints the free exercise right in broad strokes, but Ninth Circuit precedent adds detail and contour. Discussing the Free Exercise Clause, the Supreme Court has proclaimed, "[I]f [a prisoner] was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners

---

[8] The Court notes that *Yoshikawa* was decided in 2022, after the relevant conduct in this case. *Yoshikawa* does not create clearly established law, but rather describes a "long held," clearly-established principle.

who adhere to conventional religious precepts, then there was palpable discrimination by the State." *Cruz*, 405 U.S. at 322. Further, *Turner* mandates, "[T]here must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89–90 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

The Ninth Circuit has clearly established that denying prisoners the means to follow sincerely held beliefs, absent a legitimate penological interest, violates the Free Exercise Clause. *Shakur*, 514 F.3d at 885 ("Given his sincere belief that he is personally required to consume kosher meat to maintain his spirituality, we are satisfied, as a threshold matter, that the prison's refusal to provide a kosher meat diet implicates the Free Exercise Clause."); *Williams*, 791 F.3d at 1034 (holding that forcing a Muslim inmate to handle pork meat in violation of his sincerely held religious beliefs violated free exercise); *McElyea v. Babbitt*, 833 F.2d 196, 199 (9th Cir. 1987) ("Certainly, the defendants cannot erect a barrier to an inmate's access to religious reading material absent a security or penological interest.").

Moreover, to determine clearly established law, courts "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Jessop v. City of Fresno*, 936 F.3d 937, 941 (9th Cir. 2019) (quoting *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005)). In *Boles v. Neet*, the Tenth Circuit considered a similar issue. 486 F.3d 1177 (10th Cir. 2007). The complaint alleged the prison warden refused the plaintiff's request to wear certain religious garments while being transported to a hospital. *Id.* at 1179–80. The court emphasized, "To be valid, a regulation must be 'reasonably related to legitimate penological interests.'" *Id.* at 1184 (quoting *Turner*, 482 U.S. at 89). The defendant in *Boles* failed to identify a legitimate penological interest. *Id.* As a result, the analysis was "uncomplicated," and the court affirmed the district court's denial of qualified immunity. *Id.* at 1179–80. Thus, *Boles* not only clearly established the

law moving forward, but persuasively reasoned that the law was already clearly established under *Turner*.

Here too, Defendants do not identify a penological interest. Like in *Shakur* and *Williams*, the alleged conditions of incarceration plausibly prevented Plaintiff from conducting religious practices rooted in sincerely held beliefs. The analysis might be more nuanced if a penological interest was clear from the pleadings. But in the absence of one, this case is clear cut. The Court cannot determine on the face of the Complaint that qualified immunity applies.

Defendants also argue that a "reasonable but mistaken belief about the facts or about what the law requires" does not foreclose qualified immunity. (Mot. 26 (citing *Est. of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002)).) Defendants aver they made a "reasonable mistake as to the tefillin's value," and so the allegations do not "rise to an actionable claim." (Reply at 6.) This argument is unavailing for two reasons.

First, it is not clear that a reasonable mistake of fact rule preserves qualified immunity in this case. It is true that qualified immunity doctrine leaves room for state actors to make factual mistakes. But a mistake of fact is not a blank check. *Estate of Ford* stands for the principle that a reasonable mistake of fact does not foreclose a qualified immunity defense, *so long as* that fact, if the mistaken understanding were true, would absolve defendants of violating clearly established law. *See* 301 F.3d at 1049. In other words, if an officer would have violated clearly established law under either the actual facts or the mistaken facts, then qualified immunity does not apply. *cf. Saucier*, 533 U.S. at 205 ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").

It is plausible that Defendants' conduct violated the Free Exercise Clause under clearly established law whether or not the tefillin was valued over $300 dollars. If the regulation limiting only tefillin, and not other religious items, to a value less than $300 dollars is not reasonably related to a penological interest, then adhering to that regulation

21cv1429

violates the Constitution. As noted above, Defendants fail to identify the penological interest at stake in enforcing a $300 dollar value limit on tefillin, and the penological interest is not apparent on the face of the pleadings. Therefore, taking all reasonable inferences in favor of Plaintiff, a mistake of fact would not shield Defendants from the gaze of clearly established law.

Second, it is not clear that Defendants' mistake of fact was reasonable. To reiterate, Plaintiff alleges (1) he informed Defendants the tefillin was provided to him at no cost (Compl. 6–7), (2) Defendants failed to follow procedure in sending it back without consulting the prison rabbi or Plaintiff (*id.* at 7), (3) ALEPH was a pre-approved vendor and sent Plaintiff the tefillin "in accordance with the ALEPH providing Judaic religious artifacts and books to inmates incarcerated throughout the United States" (*id.* at 3), and (4) Defendant Lopez indicated that Plaintiff would not receive tefillin regardless of their cost—"not while I'm working here" (*id.* at 6). In light of these allegations, the Court can plausibly infer that mistaking the value of the tefillin was not reasonable.[9]

In sum, given the procedural posture of the motion to dismiss, the Court cannot determine on the face of the pleadings that qualified immunity applies. Defendants' arguments to the contrary are unconvincing. Hence, the Court **DENIES** Defendants' Motion to Dismiss on qualified immunity grounds.

## IV.   CONCLUSION AND ORDER

Accordingly, the Court:

(1)   **GRANTS** Defendants' Request for Judicial Notice;

(2)   **DENIES** Defendants' Motion to Dismiss for failure to exhaust under the PLRA;

---

[9] Defendants also argue without citation, "Each Defendant did not cause the entirety of the alleged deprivation. Under the circumstances alleged as pleaded by Plaintiff, no Defendant violated clearly established law, and as a result they are each entitled to qualified immunity." (Mem. 26.) It is unclear what exactly Defendants are arguing. Without more, the Court is unconvinced.

(3)   **DENIES** Defendants' Motion to Dismiss with respect to Plaintiff's First Amendment free exercise claim;

(4)   **DENIES** Defendants' Motion to Dismiss with respect to Plaintiff's Fourteenth Amendment equal protection claim against Defendant Lopez;

(5)   **GRANTS** Defendants' Motion to Dismiss with respect to Plaintiff's Fourteenth Amendment equal protection claim against Defendants Gonzalez and Garcia and **GRANTS** Plaintiff leave to amend;

(6)   **GRANTS** Defendants' Motion to Dismiss with respect to Plaintiff's Fourteenth Amendment due process claim and **GRANTS** Plaintiff leave to amend;

(7)   **GRANTS** Defendants' Motion to Dismiss with respect to Plaintiff's claim for monetary damages under RLUIPA without leave to amend as futile;

(8)   **GRANTS** Defendants' Motion to Dismiss with respect to Plaintiff's claims for monetary damages against Defendants in their official capacities without leave to amend as futile;

(9)   **DENIES** Defendants' Motion to Dismiss on qualified immunity grounds.

**IT IS FURTHER ORDERED that**:

Plaintiff is **GRANTED** forty-five (45) days leave from the date of this Order in which to either (1) notify the Court of his intention to proceed with the claims that remain in this action; or (2) file a First Amended Complaint that cures the deficiencies of pleading noted in this Order. If Plaintiff chooses to file an amended pleading, it should be complete by itself without reference to any previous version of his Complaint. Any Defendants not re-named and any claims not re-alleged in the First Amended Complaint will be considered waived. *See* CivLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered

21cv1429

waived if not repled."). Plaintiff is cautioned that he may not re-allege the claims that the Court has dismissed without leave to amend and may not add any new claims or allegations. If Plaintiff chooses the first option to move forward with the remaining claims, the Court will issue an order directing Defendants to file a responsive pleading pursuant to Rule 12(a)(4)(B).

     **IT IS SO ORDERED.**

**DATED: February 15, 2023**

Hon. Cynthia Bashant
United States District Judge